

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| JAMES CLARKE, ANTONIO CHARLES, RICHARD TAYLOR, EMMETT COLEMAN, and GLENN ANDERSON, on behalf of themselves and those similarly situated, | : : : : : : |
| Plaintiffs, | : : |
| vs. | : : |
| BERNARD LANE, Director, NEWTON, Deputy Director, CHARLES STEINER, Deputy Director, IRRASSAY, Manager, BARRY HAZZARD, Agent, NORA WILLIAMS, Nurse, IRENE BLACKWELL, JOHN CURL, IAN DENNIS, ANDREA HARRIS, LENORA KING, PATRICIA JACKSON, and COLEMAN HALL, 3950 "D" Street, Philadelphia, PA 19124, | : : : : : : : : : : |
| Defendants. | : : |

CIVIL ACTION NO.

## 08 00468

FILED

JAN 3 0 2008

MICHAEL E. KUNZ, Clerk

By _____ Dep. Clerk

## **COMPLAINT**

## **Introduction**

1.    This is a class action for injunctive and declaratory relief and for damages for the named individual plaintiffs and the class they represent to secure relief from the unconstitutional conditions of confinement which will continue to persist absent judicial intervention.



## Jurisdiction

2.      This Court has federal jurisdiction pursuant to 28 U.S.C. §§1331 and 1343; 42 U.S.C. §§1983 and 1988; and the First, Eighth and Fourteenth Amendments to the United States Constitution.

3.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

## Parties

4.      Plaintiff Jim Clarke is an adult individual residing in Downington, Pennsylvania and was confined in Coleman Hall from September 26, 2006 to December 24, 2006.

5.      Antonio Charles is an adult individual who has been residing at Coleman Hall from July 9, 2007 to the present.

6.      Richard Taylor is an adult individual who has been residing at Coleman Hall from March 19, 2007 to the present.

7.      Emmett Coleman is an adult individual who has been residing at Coleman Hall from September 19, 2007 to the present.

8.      Glenn Anderson is an adult individual who is an inmate at SCI-Graterford and was confined in Coleman Hall from August 6, 2007 to on or around December 2, 2007.

9.      Defendant Coleman Hall is located at 3950 "D" Street, Philadelphia, PA 19124 and is owned and operated by Community Education Centers, 35 Fairfield Place, West Caldwell, NJ 07006.

10.     Defendant Director Bernard Lane is the person responsible for the operations

of Coleman Hall and an employee of Coleman Hall.

11.    Defendant Deputy Director Newton is an employee of Coleman Hall.

12.    Defendant Charles Steiner is Deputy Director of Clinical Programs at Coleman Hall.

13.    Defendant Irrassary is a unit manager and an employee of Coleman Hall.

14.    Defendant Agent Barry Hazzard is an employee of the Pennsylvania Board of Probation and Parole.

15.    Defendant Nora Williams is an employee of Community Education Centers assigned to Coleman Hall.

16.    Defendant Irene Blackwell is an employee responsible for Program Activities at Coleman Hall.

17.    Defendant John Curl is Deputy Director of Operations at Coleman Hall.

18.    Defendant Ian Dennis is or was an employee of Coleman Hall.

19.    Defendant Andrea Harris is an employee at Coleman Hall.

20.    Defendant Lenora King is a unit supervisor at Coleman Hall

21.    Defendant Patricia Jackson is an employee of Coleman Hall.


## Factual Allegations

**JIM CLARKE**

22.    Plaintiff Clarke was diagnosed with epilepsy in 2004.

23.    Plaintiff Clarke was prescribed 600 m.g. of Dilantin per day for the epilepsy and was taking 300 m.g. in the afternoon and 300 m.g. in the evening each day.

24.     Plaintiff Clarke was arrested midday on September 26, 2006 by agents of the Pennsylvania Board of Probation and Parole for violating the terms of his probation.

25.     Plaintiff Clarke was taken to Coleman Hall at approximately 5 p.m. in the evening of the 26th of September, 2006.

26.     Plaintiff Clarke informed Defendant Hazzard during transport that he was an epileptic, that he was suffering from headaches and that he needed medication as he had not taken any that day.

27.     Defendant Hazzard told Clarke that he would get medication later that day, and told Irrassary that Clarke was an epileptic.

28.     Upon arrival at Coleman Hall Defendant Hazzard and Irrassary strip searched Clarke during admission.

29.     Plaintiff Clarke's vision was becoming blurry so he told Unit Manager Irrassary that he was epileptic and needed Dilantin immediately.

30.     Director James Newton was present and supervised Hazzard and Irrassary during these intake procedures.

31.     Plaintiff Clarke was then taken to a lockdown unit by Defendant Unit Manager Irrassary and assigned an upper bunk.

32.     Approximately one and half hours later, Defendant Nurse Nora Williams interviewed Clark, at which time he informed her that he had not taken any medication that day and was 6 hours overdue for his Dilantin medication.

33.     Defendant Williams told Clarke that he was responsible for his own medications but that she would see if she could do anything.

4

34. Clarke received no other medical screening upon his entry to Coleman Hall.

35. At approximately 10 p.m., Defendant Williams called Clarke into her office and gave him 3 generic 100 m.g. pills of Dilantin, which was only half the amount of Dilantin that Clarke normally would have taken by this time in the day.

36. Clarke asked for the brand name pills he had been taking but was told he would have to get those pills himself by contacting friends or relatives.

37. Plaintiff Clarke suffered an epileptic seizure at approximately 4:45 a.m. on the morning of September 27, 2006.

38. Another Coleman Hall resident in Clarke's room sought the assistance of a staff member to help Clarke, but no assistance came for several hours.

39. Plaintiff Clarke awoke on the floor at approximately 7 a.m. on September 27, 2006 bleeding from the lip, a bruised knee, a sprained neck and shoulder and a chipped tooth, a broken front tooth, and subsequent ear and hearing problems.

40. Plaintiff Clarke asked Operations Manager Carroll and Counselor Hamilton for medical assistance but was told he would have to wait until the day shift arrived.

41. Defendant Williams arrived, observed Clarke's condition and asked why he hadn't gotten a lower bunk as she had suggested.

42. Clarke was taken to Northeastern Hospital at approximately 11:45 a.m., treated for the injuries and returned to Coleman Hall at approximately 6 p.m.

43. Plaintiff Clarke was told repeatedly by several Coleman Hall employees including Nurse Williams and Unit Manager Irrassary that Clarke was responsible for his own medical care and prescriptions and that he could go to instead go to SCI-Graterford

5

and get additional treatment.

44.    On October 2, 2006, Plaintiff Clarke was taken to the Temple Dental School but was turned away as he did not have the proper identification.

45.    Plaintiff Clarke did not receive a full examination until October 6, 2006 when he was examined by Dr. Castro.

46.    Plaintiff Clarke was later taken to Temple Hospital for additional treatment for the injuries he suffered during the seizure.

47.    Plaintiff Clarke suffered a second seizure in November 2006.


**ANTONIO CHARLES**

48.    Antonio Charles is a resident at Coleman Hall, and is a pre-release resident.

49.    For the past five years, Charles has suffered from asthma.

50.    Charles received no medical screening upon entry on July 9, 2007 to Coleman Hall, and no one asked him about his asthma condition.

51.    On July 23, 2007, Charles had an asthma attack and he had great difficulty breathing.

52.    Charles used the inhaler which he had received prior to his arrival at Coleman Hall, but it provided no relief.

53.    When a staff member arrived to unlock the door, he went to nurse Williams and informed her that he was having problems breathing, and Williams escorted him out of the building to the yard.

54.    No other medical staff was on site who could provide additional medical care.

6

55.    Charles then had to wait 30 minutes while he waited for approval for a pass that would permit him to seek medical attention outside of Coleman Hall.

56.    Charles took the public bus as no transportation was obtained to the emergency room at Temple University Hospital, during which Charles experienced great pain and difficulty breathing.

57.    At the hospital, Charles was placed on a nebulizer and steroid pills and returned to Coleman Hall via public transportation.

58.    The next morning on July 24, 2007, at approximately 6:30 a.m., Charles suffered another asthma attack.

59.    Charles promptly informed the staff, but Coleman Hall employee Defendant Ian Dennis refused to permit Charles to go to the hospital for medical assistance, and ordered him to wait for the nurse.

60.    The nurse did not arrive until approximately one hour later from when Charles began to have great difficulty breathing.

61.    The nurse, Noreen McCaffery, recommended and granted approval for Charles to go to the emergency room at Temple University Hospital—Episcopal Campus.

62.    Charles was not provided any transportation or bus fare, is not from the local area and has no family in the area who would be able to drive him; and therefore, he was forced to walk to the hospital.

63.    Because Charles had difficulty breathing, his walk to the hospital took two hours.

64.    Afterwards, Charles was told by Coleman Hall staff to apply for Medicaid and

7

get his own doctor.

65.     Charles also received a recommendation from his primary physician, Dr. Romeo Nillas, for him to be able to go outside for fresh air, but Coleman Hall staff ignored his requests and grievances.

66.     The unit manager Pamela Weber informed Charles that they do not always follow the nurses' recommendations.

67.     On October 1 or 2, 2007, Charles experienced a third asthma attack.

68.     Charles informed Defendant John Curl, Director of Security Operations, who granted permission to go to the hospital, but provided no transportation even after Charles informed him that he had no money for the bus, and Charles was forced to walk to the hospital again

69.     On December 17, 2007, Charles was injured and knocked unconscious on the job.

70.     Charles was taken to Temple University Hospital by an ambulance from his worksite, and then treated for neck and back injuries.

71.     At the hospital, Charles was visited by Coleman Hall staff member, Defendant Irene Blackwell, but when he asked Blackwell for a ride back to Coleman Hall, she refused, and Charles was required to return to Coleman Hall by walking, with assistance by another Coleman Hall resident, Richard Taylor.

72.     After Charles' asthma attack on July 23, 2007 and July 24, 2007, Charles filed a grievance on July 25, 2007 addressed to Weber.

73.     Defendant Deputy Director Charles Steiner spoke to Charles about the

8

grievance and informed Charles that he had forwarded the grievance to Ms. Wertz, and recommended that he again write the grievance issues on a request slip and give it to his counselor, Irassary, which Charles later did.

74.    Charles received no response to either the grievance or request slip to his counselor.

75.    Upon recommendation by the unit manager Weber, Charles sent another grievance to Libra Footman on August 7, 2007 regarding the failure of Steiner and Irassary to address the grievance.

76.    On the morning of Labor Day, September 3, 2007, Steiner took Charles' pass away for that day by placing him on "complete restriction," and the next day unit supervisor Defendant Lenora King made reference to his filing many grievances.

77.    After Charles' asthma attack on October 1, 2007, Charles filed a grievance by placing it in the box on Friday, October 5, 2007.

78.    On Monday, October 8, 2007, Charles left Coleman Hall to attend his regularly scheduled mental health treatment appointment with his regular therapist at the Men and Women for Human Excellence, but while Charles was at his appointment, he received a call from Coleman Hall notifying him that he was to return to Coleman Hall.

79.    When Charles returned to Coleman Hall, he was informed that he would not be permitted to go to the Men and Women for Human Excellence anymore, and could only attend programs at Gaudenzia, and only go to doctors related or connected to Coleman Hall.

80.    Charles was also informed that all his social passes were taken away.

9

81.     Social passes permit Coleman Hall residents to visit family and friends on the weekend, and are given out to almost all individuals who are not in the 24-hour lockdown unit.

82.     Social passes and placing residents on "complete restriction" are frequently taken away as a form of punishment.

83.     A few days later, Charles was threatened by Curl that he would be sent back to prison.

84.     Charles was repeatedly denied social or weekend passes from October to December 2007.

85.     On Friday, November 30, 2007, Charles' attorney faxed a request to set-up an attorney visit with Charles and others for the following Monday, December 3, 2007.

86.     The visit was approved, but Charles and other individuals were placed on "complete restriction" for the entire weekend, and thus were denied any social passes and not permitted to leave the building.

87.     Charles was again placed on complete restriction on or around December 7, 2007 for two weeks.

88.     On several occasions, Charles' locker would be searched soon after he filed a grievance.

89.     Around October 1, 2007, Charles' items were confiscated and thrown out, including his only copy of his birth certificate and legal materials.

**RICHARD TAYLOR**

90.    Richard Taylor is a resident of Coleman Hall and is a pre-release resident.

91.    On Friday, November 16, 2007, Taylor was riding a public bus when the bus got into an accident at Front Street and Erie Avenue, injuring Taylor's back.

92.    Taylor promptly called Coleman Hall to inform them that he needed to go to the hospital.

93.    Coleman Hall refused to grant permission for him to go to the hospital so he returned to Coleman hall.

94.    On Saturday, November 17, 2007, Taylor used his social pass to go to Temple University Hospital.

95.    Taylor was required to walk to the hospital because Coleman Hall provided no transportation and he had no money for the bus.

96.    At the hospital, Taylor was not seen in the time granted by the social pass, so he returned to Coleman Hall without being evaluated by any medical personnel, otherwise he would be considered late.

97.    On Sunday, November 18, 2007, Taylor again used a social pass to return to the hospital, where he was then evaluated by the hospital.

98.    Taylor was medically advised to avoid physical labor at work, and to seek follow-up medical treatment with a primary physician.

99.    Because Taylor's past primary physician was a pediatrician and Taylor is now an adult, he had to find a new physician, and Coleman Hall had no available physicians on staff who could evaluate and treat Taylor.

100.    Taylor did find a physician to provide follow-up medical treatment, and went

11

to his first physical therapy session on December 5, 2007.

101.   On December 7, 2007, Coleman Hall placed Taylor on "complete restriction" for allegedly deviating from his pass previously when he attended his first physical therapy session, and therefore, Taylor was prevented from accessing any follow-up medical treatment for several weeks until January 2, 2008.

102.   In January 2007, Taylor had an appointment with his attorney. His counselor Defendant Patricia Jackson asked him about why he was going to see an attorney, and refused to permit him to go to his appointment unless he told her.

103.   A day or so later, Director Newton placed Taylor on complete restriction causing Taylor to miss his appointment with his attorney and also causing him to miss physical therapy sessions later in the week.


**EMMETT COLEMAN**

104.   Emmett Coleman is a resident of Coleman Hall and is a parolee.

105.   100.   On November 25, 2007, Coleman asked the nurse Kathie Thompson about a bump on his left buttock.

106.   Thompson provided anti-septic wipes and Tylenol and recommended that he be evaluated by medical staff the next morning.

107.   On November 26, 2007, Coleman asked the nurse, Nora Williams, for permission to seek medical treatment, and she approved the request, noting that Coleman should be send to the emergency room at Frankford Hospital for evaluation and treatment.

108.   Coleman then asked a counselor, Defendant Andrea Harris, for permission to

12

seek medical treatment based on the nurse's approval, but Harris denied this request and treatment was denied.

109.    On November 27, 2007, Coleman used his "job search pass" that permitted him to leave for the purpose of seeking a job to go to Frankford Hospital in order to seek medical treatment.

110.    The medical staff at Frankford Hospital informed him that he had a staph infection, and was prescribed different types of antibiotics.

111.    At the hospital, Coleman called Coleman Hall to inform them that he was at the emergency room and that he would be late and they asked him to call back every hour.

112.    Coleman was required to walk to and from Frankford Hospital, a walk that takes approximately 1 ½ to 2 hours.

113.    Upon his return, Coleman was then punished for being late, and was placed on "restriction."  Later, he was placed on "complete restriction."

114.    On January 29, 2008, Coleman had an appointment with a physician, but was placed on complete restriction for an unrelated violation of house rules, impeding his ability to get medical treatment.

**GLENN ANDERSON**

115.    Glenn Anderson was a resident at Coleman Hall, and is currently an inmate at State Correctional Institution at Graterford.

116.    Glenn Anderson has experienced mental health problems for approximately 13-14 years.

117.   Around late October or early November 2007, Anderson started to be harassed and physically threatened by one of his roommates.

118.   Fearing that the resident would stab or kill him, Anderson verbally reported the matter to unit supervisor "Mr. L," but Mr. L took no active steps to investigate or protect Anderson.

119.   Upon information and belief, the resident that threatened Anderson soon after threatened or assaulted a Coleman Hall staff member, and was transferred from Coleman Hall.

120.   On a Wednesday in early November 2007, Anderson felt his mental state deteriorating, and asked nurse Williams to see the psychiatrist that is at Coleman Hall on Mondays and Wednesdays, but he was not called to see the psychiatrist.

121.   On Friday, Anderson felt that his mental health was worsening and informed unit supervisor King that he needed to receive psychiatric treatment immediately and requested to be sent to at Friends Hospital, a psychiatric hospital.

122.   Anderson was then called into a meeting with King, Steiner, and unit manager Vernon Cliett, where Steiner informed Anderson that he would not be sent to Friends Hospital and threatened to send Anderson back "upstate" if he continued his request, which meant that he was threatening to send Anderson back to prison.

123.   Steiner asked Anderson if he was thinking of killing himself, and Anderson responded that he was.

124.   After Steiner, King, and Cliett met, King later informed Anderson that he would only be sent to the hospital if he was "302'd," i.e. involuntarily committed.

125.   The following Monday, Anderson again requested to see the on-site psychiatrist but did not see her until Wednesday.

126.   By this time, Anderson was in such mental distress that he was experiencing tremors and shaking, and was finally sent to a hospital.

127.   Anderson had to be taken to the hospital several times, and one stay at Friends Hospital required hospitalization for numerous days.

128.   Upon Anderson's return from one hospital visit, Anderson was prescribed a significant amount of medication for his mental health problems and fell from the top bunk to which he was assigned, resulting in pain in his back, hip and neck.

129.   Coleman Hall staff transported him to the hospital after the fall, but did not transport him back to Coleman Hall, and thus, Anderson was required to walk back from the hospital.

130.   In September 2007, Anderson had his documents and ID confiscated from under his bed.

131.   When Anderson complained to staff member Hylich, Hylich suggested that Anderson climb into the dumpster, so Anderson did climb into the dumpster but did not find his documents.

132.   Anderson filed grievances requesting the cost of replacement for the ID, and was denied.

## Class Action Allegations

133.   Plaintiffs Charles, Taylor and Coleman seek to represent a class of all

15

persons on claims of declaratory and injunctive relief and for damages, who are being held in custody at Coleman Hall and who are subject to the policies and practices alleged in this Complaint.  The class is so numerous that joinder of their claims is impracticable.

134.   Plaintiffs' claims are typical of the claims of the class members, in that each member of the class has suffered similar harms as a result of the defendants' acts and omissions.   Plaintiffs will be adequate representatives of the class, in that they are represented by competent and skilled counsel whose interests are fully aligned with the interests of the class.

135.   There are questions of law and fact common to the class, and specifically whether defendants' practices and procedures of cursory intake examinations, delay and denial of medical care, retaliation for exercising one's rights violate the First, Eighth and Fourteenth Amendments to the U. S. Constitution.  The policies and practices of the defendants and the resulting conditions of confinement are the same for all members of the plaintiff class.

136.   The questions of fact and law that are common to the members of the class predominate over any questions affecting any individual members of the class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

137.   The defendants have acted, or refused to act, on grounds generally applicable to the class.  Final injunctive and declaratory relief is appropriate with respect to all of the members of the class.

138.   This action may properly be maintained under Federal Rule of Civil

16

Procedure 23(a) and (b)(1)(2) and (3).

## Causes of Action

139.   Defendants' failure to adequately screen new arrivals and cursory review of their medical needs constitutes a deliberate indifference to a serious medical need and thereby violates the Eighth Amendment of the U.S. Constitution.

140.   Defendants' failure to provide adequate medical care for residents of Coleman Hall constitutes a deliberate indifference to a serious medical need and thereby violates the Eighth Amendment to the U.S. Constitution.

141.   Defendants' retaliatory actions against the Plaintiffs for exercising their right to grieve issues and seek legal assistance and destruction of legal materials constitute a violation of the First Amendment rights to access the court system.

142.   Defendants' taking of Plaintiffs' property constitutes trespass and conversion of property, and the deprivation of property without due process.

## Relief Sought

WHEREFORE, all named Plaintiffs and members of the class;

-compensatory damages from all defendants;

-punitive damages from all defendants

- declaratory relief that the actions of the defendants are unconstitutional;

-injunctive relief as the court deems necessary for the class members

- reasonable attorneys fees and costs;

17

-and any other relief the court deems necessary to correct unconstitutional conditions.

Respectfully submitted,

**Pennsylvania Institutional Law
      Project**

By: _____

       Angus Love, Esquire
       I.D. #22392
       Su Ming Yeh, Esquire
       I.D. #95111
       718 Arch Street, Suite 304-South
       Philadelphia, PA 19106
       (215) 925-2966 (Telephone)
       (215) 925-5337 (Facsimile)

Date:  January 30, 2008                    Attorneys for Plaintiff